| | Size | Spacing | Span |
|---|---|---|---|
| Depth in ground | | | |
| R. W. plate | | | |
| Girders | | | |
| Joist - 1st floor | | | |
| Joist - 2nd floor | | | |
| Joist - Ceiling | | | |
| Exterior studs | | | |
| Interior studs | | | |
| Roof rafters | | | |
| Bearing Walls | | | |

STATE OF SOUTH DAKOTA
CIRCUIT COURT, HUGHES CO.
FILED
MAR - 4 2004
Christed J. Copeland CLERK
By _____ Deputy

1. District _CENTRAL BUSINESS_
2. Type of Construction I, II, III, IV, V ✓
3. Group Occupancy A B C D E F G H I J
   Division  1 2 3 4
4. Use Zone — _COMMERCIAL_
5. Fire Zone — _1_

| | |
|---|---|
| Estimated Cost | $ |

Type of Construction
Frame ✓ SPECIAL
Frame Stucco ☐ PERMIT FOR
Brick ☐ ICE MANUFACTURE
Brick Veneer ☐
Concrete Block ☐
Number off street parking spaces ☐
Number of stories ☐
Full basement ☐ No basement ☐

| | |
|---|---|
| Covering | |
| Exterior Walls | Roof |
| Interior-Walls | Reroofing |
| Flues | |
| Fire place | Fl. Furnace |
| Kitchen | Water heater |
| Furnace Gas | Oil Electric |

*I hereby acknowledge that I have read this application and state that the above is correct and agree to comply with all city ordinances and state laws regulating building construction.*
Signature of permittee _____
By _____

2005 SD 115

### In the Matter of the ADOPTION
### OF C.D.B., A Minor.

### B.M. (H.) T., Mother and Appellant,

### J.D.B., Father and Appellee.

B.M. (H.) T., Plaintiff and Appellant,

v.

J.D.B., Defendant and Appellee.

Nos. 23573, 23590.

Supreme Court of South Dakota.

Argued Oct. 4, 2005.

Decided Nov. 22, 2005.

Donald M. McCarty of McCann, Rib-
stein, Hogan & McCarty, Brookings, South

Dakota, Attorneys for appellant Mother B.M. (H.) T.

Sean M. O'Brien, Brookings, South Dakota, Attorney for appellee Father J.D.B.

KONENKAMP, Justice.

[¶1.] In this consolidated appeal, the mother seeks reversal of (1) the decision to terminate her parental rights so that the father's wife, the stepmother, can adopt C.D.B., and (2) the decision to hold the mother in contempt for not paying her child support obligation. We affirm both decisions.

## Background

[¶2.] The mother and father never married each other, but lived together and shared responsibility for their son, C.D.B., who was born in 1998. The parents eventually separated in 2000, and the mother kept physical custody of the child. The father retained the right to regular visitation under a stipulated schedule. Then in November 2002, the father petitioned the circuit court for, and was granted, physical custody because the mother was going through a difficult time in her life and had frequently left C.D.B. with the father for extended periods of time. The court ordered supervised visitation for the mother at the father's home. The visitation had to be supervised because there was a concern that the mother would leave with C.D.B. and because she had married a registered sex offender.[1] In addition to supervised visitation, the circuit court ordered the mother to pay the father child support of $130 per month to begin on January 1, 2003.

[¶3.] Despite having a visitation schedule established at the November 2002 hearing, the mother only visited C.D.B. four times. She never paid any child support. Her last contact with C.D.B. was in January 2003. In her explanation for her lack of contact with C.D.B., the mother claimed that the stepmother made her visitations difficult and that supervised visitation in the father's home did not allow her to have one-on-one time with C.D.B.

[¶4.] The mother acknowledged that "she has made some poor decisions relating to visitation." However, she insisted that she had matured and called the father in early October 2004 to ask him what she needed to do to start seeing her son again. Within days of the mother's telephone call, the father married the stepmother and filed a petition for adoption. While it was true that they married on October 13, 2004, and filed the petition for adoption on that same day, the father explained that the purpose was not to prevent the mother from reestablishing her relationship with C.D.B. Instead, the father and stepmother said that they wanted to provide the child with a stable and loving home.

[¶5.] After learning that the stepmother had petitioned for adoption, which, if granted, would terminate the mother's parental rights, the mother wrote a letter to the circuit court.[2] An evidentiary hearing was held to determine whether the mother had in fact abandoned C.D.B. and whether the best interest of the child would be served if the mother's parental rights were terminated and the stepmother's adoption proceeded.

---

1. When the mother's husband, T.T., was nineteen he impregnated a fifteen-year old girl who thereafter sought aid from the State. He was charged and convicted of statutory rape.

2. Her parents also wrote a letter because they did not want their relationship with their grandson to change. From the time C.D.B. was born, the mother's parents have had consistent contact and visitation with C.D.B. and feared that this relationship would cease if the stepmother was allowed to proceed with the adoption.

[¶ 6.] At the hearing, before Judge David R. Gienapp, the court took judicial notice of the parents' custody file and heard testimony from the father, the mother, the stepmother, and several other witnesses. The mother insisted that she did not have the requisite intent to abandon C.D.B. and that terminating her parental rights would not be in her child's best interests. Moreover, the mother said that because she called the father in early October 2004, this fact supported a finding she had not abandoned C.D.B. for the six months "immediately prior to the filing of the Petition" as required by SDCL 25–6–4(2).[3] She admitted, however, that for the six months prior to the filing of the petition she had not communicated with her son, who was age six at the time. In fact, she said that she had seen him "in some stores, but I have never gotten in front of him to say something to him." Nonetheless, the mother claimed that the adoption should be denied because the father and the stepmother have had an unstable relationship, a belief the father's own family supported.[4]

[¶ 7.] After the circuit court considered all the evidence, it found that the mother lived a nomadic lifestyle, only sporadically visited C.D.B., never paid child support, did not ask to speak with C.D.B. when she called in early October 2004, and made no "recognition of Christmas or birthdays of the minor child dating back to at least 2002 and possibly further." The court emphasized that the mother's "testimony at trial as to the reasons for her non-contact [were] not deemed credible or realistic." On the other hand, the court regarded the testimony of the stepmother as "credible and believable." Consequently, the court held that the father had "established by clear and convincing evidence that [the] mother has abandoned the minor child." Specifically, the court ruled that "the evidence shows that [the] father took custody of the minor child and [the stepmother] has been involved in the parental duties relating to the minor child, and has basically taken the place of his missing mother . . . and that the reasons given by the natural mother as to why she failed to follow through with visitation are not credible."

[¶ 8.] The father also filed a motion for contempt against the mother for her failure to pay child support. In that proceeding, before Judge Rodney J. Steele, the mother alleged that she had not "willfully and contumaciously" failed to pay because she did not know she was supposed to start making payments, since she never personally received the order. In addition, the mother claimed that because the father never attempted to enforce the child support order against her, she should not be held in contempt. The circuit court found that (1) an order existed, (2) the mother had actual notice of her obligation in November 2002 because she was present when the court issued the order, (3) she had the ability to pay, and (4) her failure

---

3. According to SDCL 25–6–4, no child may be adopted without the parents' consent unless one of the statutory exceptions is met. In addition, when an exception is met, the trial court must consider the best interests of the child before waiving the requirement for parental consent.

4. At the hearing, the father's sister and the paternal grandmother testified that they did not believe the relationship between the father and the stepmother, who had been living together for four years, was strong because the engagement was called off, then put back on, and finally the date was moved up for purposes of this adoption. The paternal grandmother wanted the father to wait to proceed with the adoption until the couple had been married for some time to be sure the marriage would work. The father's sister expressed the same concerns.

to make any payment whatsoever was willful and contumacious.

[¶ 9.] The mother appeals raising the following issues: (1) did the trial court err when it found that the mother had abandoned C.D.B.; (2) did the trial court abuse its discretion when it determined that it was in the best interest of C.D.B. to proceed with the adoption; and (3) did the trial court err when it held the mother in contempt for not paying child support?

### Analysis and Decision

[¶ 10.] "Whether a parent has abandoned a child within the meaning of SDCL 25–6–4 is a question of fact to be decided by the trial court, a decision that will not be overturned unless the finding is clearly erroneous." *In the Matter of Adoption of Bellows*, 366 N.W.2d 848, 850 (S.D.1985); *In the Matter of Adoption of Everett*, 286 N.W.2d 810, 814 (S.D.1979); *In the Matter of Adoption of Christofferson*, 89 S.D. 287, 290, 232 N.W.2d 832, 834 (1975). Findings of fact are clearly erroneous when, after a careful review of the record, "we are left with a firm conviction that a mistake has been made." *In the Matter of Adoption of Baade*, 462 N.W.2d 485, 488 (S.D.1990).

[¶ 11.] After a court finds abandonment under SDCL 25–6–4(2), it must exercise its discretion to determine whether the child's best interests will be served by terminating the rights of the parent so that an adoption can proceed without that parent's consent. "When reviewing whether a court has abused its discretion, we do not decide whether we would have made the same ruling, but only if a judicial mind could have made a similar decision in view of the law and the circumstances." *Meldrum v. Novotny*, 1999 SD 127, ¶ 11, 599 N.W.2d 651, 653 (citing *Johnson v. Johnson*, 468 N.W.2d 648, 650 (S.D.1991)). An abuse of discretion occurs when a court has made "a fundamental error of judg-

ment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Arneson v. Arneson*, 2003 SD 125, ¶ 14, 670 N.W.2d 904, 910.

### 1. Abandonment

[¶ 12.] The mother maintains that her call to the father in early October 2004 clearly supports her intent to reestablish, not abandon, her relationship with C.D.B. However, the father contends that even if the mother's call is construed as an attempt, it should not negate the finding of abandonment under SDCL 25–6–4(2). We have previously determined that "[t]o constitute abandonment under our code it must appear by clear and convincing evidence that there has been by the parents a giving-up or total desertion of the minor child." *Mastrovich v. Mavric*, 66 S.D. 577 287 N.W. 97, 97 (1939); *see also, Adoption of Bellows*, 366 N.W.2d at 850; *In the Matter of Adoption of Ernst*, 318 N.W.2d 353, 354 (S.D.1982); *Adoption of Everett*, 286 N.W.2d at 814; *Adoption of Christofferson*, 89 S.D. at 290, 232 N.W.2d at 834. In addition, "[t]here must be a showing of an intent on the part of the parent to abandon and to relinquish parental obligations; this intent may be inferred from conduct." *In the Matter of Adoption of Sichmeller*, 378 N.W.2d 872, 873 (S.D.1985) (citing *Adoption of Christofferson*, 89 S.D. at 290, 232 N.W.2d at 834). When examining intent, the court should consider "a parent's presence, love, care and affection, and monetary support." *Id.* (citation omitted).

[¶ 13.] It is undisputed that the mother has not contacted C.D.B. during the last six months before the filing of the petition for adoption and that the last actual contact was in January 2003. Even when she saw him in stores, she made no effort to talk to him. It is also undisputed that

when the mother called in October 2004 she did not ask to speak to C.D.B. However, she asserts that her mere failure to request to speak to C.D.B., who was sleeping, is not enough to establish by clear and convincing evidence that she abandoned her son. Moreover, the mother claims that her rights should not be terminated because the father and the stepmother are trying to prevent her from maintaining a relationship as evidenced by their marriage and petition for adoption filed shortly after the mother called.

[¶ 14.] The court was entitled to infer the mother's intent from the totality of her conduct. First, the court found that the mother "made absolutely no attempts to pay any support toward the minor child since the father took over custody." Second, the court found that she "has not made any recognition of Christmas or birthdays of the minor child dating back to at least 2002 and possibly further." Third, the court believed "that the mother may not even have been interested in the contest that has evolved, but for the urging of the maternal grandparents."

[¶ 15.] To conclude that evidence is clear and convincing, "the witnesses must be found to be credible, ... the facts to which they have testified [must be] distinctly remembered and the details thereof narrated exactly and in due order, and ... their testimony [must be] so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Adoption of Bellows,* 366 N.W.2d at 851 (quoting *Cromwell v. Hosbrook,* 81 S.D. 324, 329, 134 N.W.2d 777, 780 (1965)). Here, the circuit court found that the mother's "testimony at trial as to the reasons for her non-contact with the minor child were not deemed credible or realistic." But, the testimony of the stepmother was "credible and believable." As a result, the circuit court concluded that the father and stepmother "established by clear and convincing evidence" that the mother had abandoned C.D.B. for six months or more immediately prior to the filing of the petition.

[¶ 16.] Despite these findings, the mother insists that the circuit court "erred in finding by clear and convincing evidence that abandonment occurred" because it "conducted an incomplete and inaccurate analysis of the facts at hand." On the contrary, the evidence supports the court's conclusions. This evidence need not be disregarded because of the mother's eleventh-hour phone call after having made no contact with her child for much longer than six months. We understand that the seriousness and finality of this decision implicates the mother's fundamental interests as a parent. *Adoption of Bellows,* 366 N.W.2d at 851 (citations omitted). However, the mother's "right is neither absolute nor unconditional." *Id.* Decisions to terminate parental rights and allow an adoption are not made to punish wayward parents, but to protect children. Here, "we are in no position to reweigh the evidence [and] ... must defer to the judge's firsthand perception of the witnesses and the significance the judge gave to their testimony." *Zepeda v. Zepeda,* 2001 SD 101, ¶ 19, 632 N.W.2d 48, 55 (citations omitted).

## 2. Best Interests of the Child

[¶ 17.] Before a court can grant a petition for adoption waiving the requirement for parental consent under SDCL 25-6-4, it must first consider the best interests of the child. There are no formulas to guide such decisions. SDCL 25-6-2 simply requires a court to give "paramount consideration to the best interests of the

child" in adoption and termination of parental rights proceedings.

[¶ 18.] The mother suggests that our "best interest factors" from custody cases should be used. *See Fuerstenberg v. Fuerstenberg*, 1999 SD 35, ¶ 24, 591 N.W.2d 798, 807. Specifically, the mother claims that "[f]ailing to conduct such an analysis will infringe on the parent's fundamental interest in the care, custody, and control of her child." SDCL 25-6-2 validates some of the mother's concerns. It provides that "the court shall give due consideration to the interests of the parties to the proceedings. . . ."

[¶ 19.] In this case, after the court considered all the evidence, it found "that it is in the best interests of the minor child that the step-parent adoption go forward." Although the mother maintains that the "court's analysis focused almost exclusively on abandonment as if to infer that if the mother abandoned [C.D.B.], the termination of the mother's parental rights and the adoption itself would automatically be in [C.D.B.'s] best interests," the record and findings reflect differently. The court specifically found that "ever since the father took custody of [C.D.B.], the [stepmother] has been involved in the parental duties relating to the minor child, and has basically taken the place of his missing mother." The court considered the stepmother to be credible and believable. Moreover, the court recognized that she has been "a good caregiver" for C.D.B.

[¶ 20.] Still, the mother insists that the court abused its discretion because there is "considerable evidence on the record to show that adoption is not in [C.D.B.'s] best interest because the father and stepmother's relationship is not stable." We do not reweigh the evidence and testimony. Trial courts have broad discretion in deciding these questions. During the court's exercise of discretion, it stated several times

that the mother's claims are not credible or realistic. Furthermore, the court considered the responses to the mother's allegations given by the father and the stepmother and was obviously satisfied with their explanations. The record adequately supports the court's findings and we see no abuse of discretion in its conclusion about the best interests of C.D.B. under SDCL 25-6-2 and 25-6-4.

### 3. Contempt

[¶ 21.] When we review a court's decision to hold a parent in contempt for failure to pay child support, we will not set it aside unless it is clearly erroneous. *Taecker v. Taecker*, 527 N.W.2d 295, 298 (S.D.1995) (citing *Dougherty v. Dougherty*, 482 N.W.2d 320 (S.D. 1992)). "Four elements must be met to support a contempt finding: (1) existence of an order; (2) knowledge of the order; (3) ability to comply with the order; and (4) willful or contumacious disobedience." *Id.* (citing *Fuller v. Fuller*, 312 N.W.2d 729, 730 (S.D.1981)).

[¶ 22.] In November 2002, the mother was ordered to pay the father child support of $130 per month to begin in January 2003. The mother never paid on her obligation even though she was present at the hearing establishing the order. While it is true that the father never attempted to enforce the order through the Child Support Enforcement Office, this does not reduce the mother's conduct to something less than willful and contumacious. In fact, the mother called the Enforcement Office and thereafter obtained a copy of the order in July 2003. But she still failed to make any support payments. The court specifically concluded that the mother had actual notice of the order, "both by her presence at the hearing on November 7, 2002, and because of the fact that she picked up a copy of the order in 2003." In addition, the court found that "she had the

ability to pay child support and that she had failed and refused to pay child support." As a result, the mother's failure to pay was deemed willful and contumacious. We conclude that the decision was not clearly erroneous.

[¶ 23.] Lastly, the father moved for appellate attorney's fees under SDCL 15–17–38 and 15–26A–87.3. Based on the entire record, we conclude that the award should be denied.

[¶ 24.] Affirmed.

[¶ 25.] GILBERTSON, Chief Justice, and SABERS, ZINTER and MEIERHENRY, Justices, concur.