#26656-a-GAS

**2013 S.D. 97**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE
ADOPTION OF Z.N.F.,
a minor child.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JEROME A. ECKRICH, III
Judge

* * * *

MICHAEL V. WHEELER of
DeMersseman Jensen Tellinghuisen
  & Huffman, LLP
Rapid City, South Dakota            Attorneys for appellant
                                     father D.L.F.


BRIAN UTZMAN of
Smoot & Utzman, PC
Rapid City, South Dakota            Attorneys for appellee mother
                                     H.S.S. and adoptive father
                                     T.E.S.

* * * *

CONSIDERED ON BRIEFS
ON SEPTEMBER 30, 2013

OPINION FILED **12/18/13**

#26656

SEVERSON, Justice

[¶1.]     D.L.F. (Father) appeals the judgment and order waiving Father's consent to step-parent adoption entered on February 14, 2013, and the order for adoption entered on March 15, 2013. We affirm.

## Background

[¶2.]     Father and H.S.S. (Mother) are the biological parents of minor child Z.N.F., who was born in 2002. Father and Mother were married in 2001 in Rapid City, South Dakota. After marrying, the couple moved to Oregon. In November 2006, while residing in Oregon, Mother and Father separated.

[¶3.]     On the evening of February 21, 2007, Mother awoke to a fire consuming her house and attached garage. She and Z.N.F., who was four years old at the time, escaped. Mother believes Father intentionally caused the fire; however, Father was never criminally charged.[1] After the fire, Father voluntarily moved to Colorado, where he resided at the beginning of these proceedings.

[¶4.]     Shortly after the fire, on February 22, 2007, Mother sought and received a restraining order against Father.[2] She extended the restraining order on March 8, 2008, and again on February 25, 2009. The last restraining order expired in 2010. Mother withheld her contact information from the restraining orders, but maintained the cellphone number she acquired in Oregon until 2011.

---

1.     The Oregon court determined that "it is very probably (sic) that [Father] caused the fire at Wife's home on February 21, 2007."

2.     The restraining order was administered under Oregon law. It appears that the restraining order is similar to a protection order under South Dakota law.

-1-

[¶5.]    Mother and Father divorced in Oregon on January 24, 2008. By all accounts, the divorce was very contentious. The Oregon court granted Mother sole legal and physical custody of Z.N.F. Father was granted supervised visitation with Z.N.F. at least once a month for two to six hours. The Oregon court required Father to arrange and pay for all professionally supervised visits. Father visited Z.N.F. on two occasions. The first visit occurred on March 22, 2008. The visit lasted two hours. His next visit was on March 17, 2009. It lasted three hours. According to reports, Father's visits with Z.N.F. were appropriate and positive. The 2009 visit was the last time Father had contact with Z.N.F. Father did not attempt to modify his visitation rights in Oregon and did not attempt to register the Oregon court's decree of dissolution in South Dakota until August 9, 2012.[3]

[¶6.]    The Oregon court also ordered Father to pay $505 per month in child support retroactive to September 1, 2007. Father did not pay child support until 2009. From May 2009 through July 2009, Father paid $2,860 in child support. After July 2009, Father did not pay child support. The South Dakota trial court found that Father's child support arrearage was $67,440. The South Dakota trial court also found that Father had been employed full-time since 2009. During the year he paid child support, Father's adjusted gross income was $7,363. In the years

---

3.    The South Dakota trial court also reviewed correspondence between Father's attorney, Mother's attorney, and a parenting consultant, Judith Swinney. The trial court found that the correspondence suggests at least three things: "(1) Father requested additional visitation; (2) Mother could not or would not accommodate supervised visits at the time/dates requested by Father; and (3) Father's voluntary absence from the state of Oregon substantially complicated scheduling parenting time."

he did not pay child support, Father's adjusted gross income was $35,002 in 2010 and $32,645 in 2011.

[¶7.]     In April 2009, Mother and Z.N.F. relocated to Colorado. Mother did not inform Father she was moving. In July 2009, Mother and Z.N.F. moved to Rapid City, South Dakota. Once again, Mother did not inform Father she was moving. The South Dakota trial court found that Mother did not want Father to know where she was living and intended to conceal her whereabouts from him and his family. Mother stated that she did this for her safety and the safety of Z.N.F. Father testified that during this time he did not know where Mother and Z.N.F. resided. Father did, however, receive notification of Mother's whereabouts when he received a copy of Mother's Chapter 7 bankruptcy case in 2010.

[¶8.]     In 2010, Father purchased a life insurance policy identifying Z.N.F. as the beneficiary. Father was required to purchase the policy immediately after the divorce in 2008. Mother claims that she and Z.N.F. were unaware of its existence. Father also acquired health insurance benefits for Z.N.F. through his employer. According to Mother, she and Z.N.F. never benefitted from the insurance policy.

[¶9.]     Since the divorce, Father's parents (Grandparents) have made efforts to contact Z.N.F. They have utilized email, Facebook, and letters to reach Mother so that they could contact Z.N.F. Although Grandparents made efforts to stay in contact with Z.N.F., their success was limited. The trial court found that Father failed to make similar efforts. The court found that Father's efforts to contact Mother and Z.N.F. since 2009 were "de minimus." Father testified that he feared he may violate the restraining order by contacting Mother.

[¶10.] Mother eventually married T.E.S. (Stepfather). Mother and Stepfather initiated proceedings for adoption of Z.N.F. on October 18, 2011. Mother and Stepfather sought an order waiving Father's consent to the adoption, terminating his parental rights, and allowing a stepparent adoption. Mother and Stepfather alleged abandonment, continuous neglect, and failure to pay child support as grounds for the waiver of consent pursuant to SDCL 25-6-4(2), (3), and (4). Father opposed the adoption. He asserted that his consent could not be waived because he did not abandon Z.N.F.

[¶11.] The trial court bifurcated the consent and adoption issues. The court first tried the consent issue on August 7, 2012. On February 14, 2013, the trial court entered an order waiving Father's consent to the adoption under SDCL 25-6-4(2), (3), and (4). The court found that Father had abandoned Z.N.F., was continuously neglectful, and failed to provide child support. The court next held the adoption hearing on March 5, 2013. Father was not allowed to participate in the adoption hearing. On March 15, 2013, the trial court entered an order for adoption and terminated Father's parental rights. The court found that it was in the best interest of Z.N.F. to place him in the care of Mother and Stepfather.

[¶12.] Father appeals to this Court, arguing that the trial court erred in waiving his consent to the adoption, terminating his parental rights, and entering the order for adoption.[4]

---

4. Mother asserts that the appeal of the waiver of consent is not timely. Even though the proceedings were bifurcated, the proceedings became final after the final order for adoption. The appeal from the final order for adoption was timely.

### Standard of Review

[¶13.] "Natural parents have a fundamental right to the care, custody, and control of their children." *In re Guardianship of S.M.N.*, 2010 S.D. 31, ¶ 17, 781 N.W.2d 213, 221 (citing *Troxel v. Granville*, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000)). Typically, a child may not be adopted without the consent of the child's biological parents. SDCL 25-6-4. "However, if it is in the best interest of the child, the court may waive consent from a parent or putative father" when certain conditions are met. *Id.* The three conditions at issue in this case are abandonment, neglect, and failure to pay child support. SDCL 25-6-4(2), (3), (4).

[¶14.] "Whether a parent has abandoned a child within the meaning of SDCL 25-6-4 is a question of fact to be decided by the trial court, a decision that will not be overturned unless the finding is clearly erroneous." *In re Termination of Parental Rights over T.E.L.S.*, 2007 S.D. 50, ¶ 24, 732 N.W.2d 740, 746 (citing *In re Adoption of C.D.B.*, 2005 S.D. 115, ¶ 10, 706 N.W.2d 809, 814). Whether a parent has neglected a child under SDCL 25-6-4(3) or has failed to pay child support under SDCL 25-6-4(4) are also questions of fact reviewed under the clearly erroneous standard. "Findings of fact are clearly erroneous when, after a careful review of the record, 'we are left with a firm conviction that a mistake has been made.'" *T.E.L.S.*, 2007 S.D. 50, ¶ 24, 732 N.W.2d at 746 (quoting *C.D.B.*, 2005 S.D. 115, ¶ 10, 706 N.W.2d at 814). "In reviewing a circuit court's ruling on whether a parent has abandoned a child for purposes of adoption, 'we are in no position to reweigh the evidence and . . . must defer to the judge's firsthand perception of the witnesses and

the significance the judge gave to their testimony.'" *Id.* (quoting *C.D.B.*, 2005 S.D. 115, ¶ 16, 706 N.W.2d at 815).

[¶15.] If the court waives a parent's consent under SDCL 25-6-4, it must then exercise its discretion to determine whether it is in the best interest of the child to terminate the parent's rights so that the adoption can proceed. *See C.D.B.*, 2005 S.D. 115, ¶ 11, 706 N.W.2d at 814. It is an abuse of discretion when the court has made "a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Thurman v. CUNA Mut. Ins. Soc'y*, 2013 S.D. 63, ¶ 11, 836 N.W.2d 611, 616 (quoting *State v. Lemler*, 2009 S.D. 86, ¶ 40, 774 N.W.2d 272, 278) (additional citations omitted).

## Analysis

[¶16.] **(1) Whether the trial court erred in waiving Father's consent to the adoption.**

[¶17.] During the first stage of the bifurcated proceeding, the trial court decided whether Father's consent to the adoption could be waived under SDCL 25-6-4. Ultimately, the court waived Father's consent to the adoption under SDCL 25-6-4(2) because Father had abandoned Z.N.F. The court also waived Father's consent under SDCL 25-6-4(3) because he continuously neglected Z.N.F. Finally, the court waived Father's consent under SDCL 25-6-4(4) because he had failed to pay child support owed to Mother for the care of Z.N.F. Because SDCL 25-6-4(2), (3), and (4) provide alternative grounds for a court to waive a parent's consent to an adoption, we address each of them in turn.

## Abandonment

[¶18.]    Father first argues that the trial court erred in finding that he had abandoned Z.N.F. under SDCL 25-6-4(2). "[T]o constitute abandonment under our code it must appear by clear and convincing evidence that there has been by the parent[ ] a giving-up or total desertion of the minor child." *T.E.L.S.*, 2007 S.D. 50, ¶ 27, 732 N.W.2d at 747 (quoting *C.D.B.*, 2005 S.D. 115, ¶ 12, 706 N.W.2d at 814).

> There must be a showing of an intent on the part of the parent to abandon and to relinquish parental obligations; this intent may be inferred from conduct. In establishing abandonment, factors to be considered include a parent's presence, love, care and affection, and monetary support. The trial court may consider the subjective statements of the parents in addition to objective factors.

*Id.* (quoting *In re Adoption of Sichmeller*, 378 N.W.2d 872, 873-74 (S.D. 1985)).

> To conclude that evidence is clear and convincing, "the witnesses must be found to be credible, . . . the facts to which they have testified must be distinctly remembered and the details thereof narrated exactly and in due order, and . . . their testimony must be so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

*Id.* (quoting *C.D.B.*, 2005 S.D. 115, ¶ 15, 706 N.W.2d at 815).

[¶19.]    The trial court found by clear and convincing evidence that Father had abandoned Z.N.F. In reaching its conclusion, the trial court stated:

> Father has done nothing of significance to maintain or reestablish contact with Z.N.F. Father's conduct over the past four years, his near complete failure to pay any child support, his utter laying aside of his parental responsibilities, his failure to act to reconnect with Z.N.F. when the means and knowledge to do so were known to him demonstrate an absolute relinquishment of care and control of Z.N.F.

In response to the court's finding, Father asserts that Mother made it difficult for him to maintain contact with his son. For instance, Father highlights Mother's deliberate attempts to conceal her whereabouts from him. Mother contends that while she did not advertise her whereabouts, she could have easily been found had Father tried to locate her. The trial court stated, "Mother's actions to conceal her whereabouts do not explain Father's lack of effort." The court then found that Father's lack of effort to contact Z.N.F. demonstrated a total desertion of his son.

[¶20.]      There is little question that Mother took steps to restrict Father's access to Z.N.F. Mother moved to Colorado and South Dakota in 2009 without telling Father. Mother also made it difficult for Grandparents to contact Z.N.F. We do not condone Mother's actions to hinder visitation; however, Mother's obstacles do not excuse Father's limited efforts to contact his son. The trial court found that Grandparents were able to contact Z.N.F. Grandparents sent Mother emails and sent Z.N.F. birthday cards. Father did nothing. Father's claim that he did not know where Mother lived is unconvincing. The trial court found that Father could have located Mother through an internet search, Facebook, or by asking his parents (Grandparents). Additionally, Mother maintained the same cellphone number she acquired in Oregon until 2011. Father also obtained Mother's address through Mother's Chapter 7 bankruptcy proceedings in 2010. These facts convinced the trial court that Father could have attempted to contact Z.N.F., yet failed to do so.

[¶21.]      Father further argues that Mother's restraining orders made it difficult for him to visit Z.N.F. because he could not contact Mother. As the trial court noted, the restraining orders did not restrict Father's contact with Z.N.F.

Father was still allowed visitation with his son.  Notably, despite the restraining orders, Father had twice sought and received visitation with Z.N.F. in 2008 and 2009.  Father knew he could contact Z.N.F. without fear of the restraining orders.  The restraining orders do not explain Father's failure to contact Z.N.F. after 2009.

[¶22.]		Additionally, the trial court's finding that Father abandoned Z.N.F. is further supported by Father's failure to pay child support.  The Oregon court required Father to pay $505 per month for child support retroactive to September 1, 2007.  However, Father did not pay child support until May 2009.  From May 2009 through July 2009, Father paid $2,860 in child support.  Notably, Mother had already moved from Oregon to Colorado during that time.  Father then did not pay child support after July 2009.

[¶23.]		Father contends that he did not pay child support because of limited financial resources, Mother's constant moving, and a lack of knowledge about where to send the payments.  Father argues that our decision in *T.E.L.S.* supports his failure to pay.  2007 S.D. 50, 732 N.W.2d 740.  In that case, we upheld the trial court's decision to deny termination of parental rights in connection with an adoption.  *Id.* ¶ 32, 732 N.W.2d at 748-49.  We held that it was not clearly erroneous for the trial court to find that the father had not abandoned his child when he was of limited means and had paid over $16,000 in child support.  *Id.* ¶ 33, 732 N.W.2d at 749.  We noted that the father also attempted to send gifts to T.E.L.S. and father arranged trips to visit the child even though the father lived in California.  *Id.* ¶ 34, 732 N.W.2d at 749.  In contrast to our holding in *T.E.L.S.*, Father had more means to pay some semblance of child support, yet paid less than the father in *T.E.L.S.*

The trial court found that Father had sufficient income to support Z.N.F., yet he willfully refused to do so. The court also found Father's other reasons for failing to pay child support unpersuasive. In both 2010 and 2011, Father made over $30,000 in gross income. Furthermore, Father paid child support after Mother had already moved. Father's failure to provide monetary support for Z.N.F. is another factor leading to the conclusion that Father abandoned Z.N.F.

[¶24.] Lastly, Father's other explanations to show he did not intend to abandon Z.N.F. do not render the trial court's decision clearly erroneous. Father argues that his purchase of a life insurance policy for Z.N.F. proves that he did not intend to abandon his son. The Oregon court required Father to purchase the policy in 2008; however, Father did not purchase the policy until 2010. Father, nonetheless, argues that the untimely purchase of the life insurance policy illustrates a recent intent not to abandon Z.N.F. The trial court found that this "demonstrates little, if any, intent to maintain contact or provide support for Z.N.F." We agree with the trial court and conclude that its decision was not clearly erroneous. This one act of support, which was mandated by the Oregon court, does not show an intent not to abandon Z.N.F.

[¶25.] Father also highlights that he recently made Z.N.F. a beneficiary to his health insurance policy. He contends that this shows that he did not intend to abandon Z.N.F. The trial court found that neither Mother nor Z.N.F. benefitted from the policy. Father does not articulate how this policy benefitted Z.N.F. Additionally, Mother and Z.N.F. were completely unaware of its existence. There is also no evidence that Father purchased the policy. Given these facts, it was not

clearly erroneous for the trial court to reject Father's argument that the acquisition of an insurance policy showed an intent not to abandon.

[¶26.]	When viewed in totality, the decision to waive Father's consent to the adoption under SDCL 25-6-4(2) was not clearly erroneous.  "[W]e are in no position to reweigh the evidence and . . . must defer to the judge's firsthand perception of the witnesses and the significance the judge gave to their testimony."  *C.D.B.*, 2005 S.D. 115, ¶ 16, 706 N.W.2d at 815 (quoting *Zepeda v. Zepeda*, 2001 S.D. 101, ¶ 19, 632 N.W.2d 48, 55).  We understand "the seriousness and finality of this decision[.]"  *Id.* However, "[d]ecisions to terminate parental rights and allow an adoption are not made to punish wayward parents, but to protect children."  *Id.*

### Continuous Neglect

[¶27.]	The trial court also found by clear and convincing evidence that Father continuously neglected Z.N.F. under SDCL 25-6-4(3).  Both briefs acknowledge this fact, however, neither one addresses it directly.  Because we review continuous neglect, like abandonment, as a question of fact, we will not overturn the trial court's finding of continuous neglect unless it was clearly erroneous.

[¶28.]	Under SDCL 25-6-4(3), a finding of continuous neglect can serve as an independent basis to waive a parent's consent to an adoption.  While there is some overlap, a finding of continuous neglect is distinct from abandonment.  Given that neither party contests the issue of continuous neglect under SDCL 25-6-4(3), and that the factual record lends support for its finding, we hold that the trial court's decision to find continuous neglect by clear and convincing evidence was not clearly erroneous.

## Failure to Pay Child Support

[¶29.] The trial court also waived Father's consent to the adoption of Z.N.F. under SDCL 25-6-4(4)[5] because Father was financially able, yet willfully neglected to pay for "subsistence, education, or other care" where legal custody of Z.N.F. was with Mother and child support payments were ordered by the court. Consistent with SDCL 25-6-4(2) and (3), the failure to provide support under SDCL 25-6-4(4) is a finding of fact that must be proved by clear and convincing evidence. Thus, we will not upset the trial court's finding unless it was clearly erroneous.

[¶30.] Mother argues that the failure to pay child support under SDCL 25-6-4(4) serves as an independent basis for a court to waive Father's consent to the adoption. The trial court agreed. Father argues that he was not financially able to provide child support. He also contends that Mother made it difficult for him to provide support. Furthermore, Father argues that the failure to pay child support should not be the sole reason for waiving his consent under SDCL 25-6-4(4).

[¶31.] SDCL 25-6-4(4) is a relatively new provision. We have yet to consider whether the failure to pay child support can be an independent reason to waive a natural parent's consent to an adoption. Normally, we have considered monetary

_____

5. SDCL 25-6-4(4) provides:

> No child may be adopted without the consent of the child's parents. However, if it is in the best interest of the child, the court may waive consent from a parent or putative father who: . . . (4) Being financially able, has willfully neglected to provide the child with the necessary subsistence, education, or other care necessary for the child's health, morals, or welfare or has neglected to pay for such subsistence, education, or other care if legal custody of the child is lodged with others and such payment ordered by the court[.]

support as a factor in determining whether a child has been abandoned. *See generally T.E.L.S.*, 2007 S.D. 50, 732 N.W.2d 740; *C.D.B.*, 2005 S.D. 115, 706 N.W.2d 809. Nevertheless, the use of "or" in the statute makes clear that the willful failure to pay court ordered child support can serve as an independent basis to waive a natural parent's consent to an adoption. This reading is supported by a similar provision under Wyoming law. *See In re Adoption of RMS*, 253 P.3d 149 (Wyo. 2011) (holding that a court may waive a parent's consent to an adoption under Wyo. Stat. Ann. § 1-22-110(a)(iv) (West 1977) where the parent willfully failed to pay child support for a period of one year before the adoption petition). Thus, we hold that a parent's willful failure to pay child support can be grounds for waiving the parent's consent to an adoption.[6]

[¶32.]     In seeking to waive an adoption under SDCL 25-6-4(4), the court must find by clear and convincing evidence that there was a failure to pay child support, and that such failure was willful. Father asserts that his failure to pay child support was not willful because he did not have sufficient money to pay, and did not know where to send it if he did. The evidence does not support his claim. First, Father never sought to amend the child support order. Additionally, when Father paid child support in 2009, his gross income was significantly lower than in 2010 and 2011, years he did not pay child support. In total, Father has paid only $2,860 in child support since the Oregon court ordered the payments in 2007. Meanwhile,

---

6.     Unlike other states, SDCL 25-6-4(4) does not provide a timeframe for how long an individual must fail to pay child support before his or her consent to an adoption can be waived. We need not decide that here. We believe Father's failure to pay child support since 2009 coupled with over $67,000 in child support arrearage justifies the trial court's use of SDCL 25-6-4(4).

Father owes $67,440 in child support arrearage. Thus, Father has paid only four percent of the child support he was expected to provide to Mother and Z.N.F. since 2007. The evidence supports the trial court's finding that Father had the ability to pay child support, yet willfully refused to pay.

[¶33.] Additionally, Father argues that Mother's attempts to conceal her whereabouts obstructed his ability to pay child support. Father's argument does not explain why he failed to pay child support from 2007 to 2009 when Mother resided in Oregon. In addition, his argument is undermined by the fact that he made his first child support payment *after* Mother moved to Colorado from Oregon. The trial court found that Father's excuses for failing to pay child support lacked credibility. Father provides no evidence to explain why that finding was clearly erroneous other than that Mother moved around. We conclude that this obstacle does not excuse the failure to pay child support. The trial court's decision to waive Father's consent to the adoption under SDCL 25-6-4(4) was not clearly erroneous.

[¶34.] **(2) Whether the trial court should have considered the best interest of the child before waiving Father's consent.**

[¶35.] After waiving Father's consent to the adoption, the trial court next found that it was in the best interest of the child to allow Stepfather to adopt Z.N.F., terminating Father's parental rights. Father argues that the trial court failed to address whether it was in the best interest of the child to waive his consent. Father contends that SDCL 25-6-4 requires a court to consider the best interest of the child at the time the waiver of consent is requested.

[¶36.] There is no question that the trial court must determine whether it is in the best interest of the child to terminate a natural parent's parental rights and

proceed with an adoption. *C.D.B.*, 2005 S.D. 115, ¶ 11, 706 N.W.2d at 814. In the second part of the bifurcated proceeding, the trial court found that it was in the best interest of Z.N.F. to allow Stepfather to adopt the child. The court found that Stepfather, Mother, and Z.N.F. engage in numerous recreational activities together including skiing, hiking, and baseball. The court also found that both Mother and Stepfather are able to provide a "loving, nurturing, and wholesome environment to [Z.N.F.]" Additionally, the court found that Stepfather desires to and is willing to assume full parental responsibility of Z.N.F. Thus, we do not find that it was an abuse of discretion for the trial court to determine that it was in the best interest of the child to allow Stepfather to adopt Z.N.F. Father argues, however, that the trial court was also required to consider the best interest of the child when it chose to waive Father's consent to the adoption.

[¶37.] SDCL 25-6-4 states that "if it is in the best interest of the child, the court may waive consent from a parent or putative father who" meets the criteria of one of the enumerated categories. Father argues that a plain reading of the statute requires the trial court to consider the best interest of the child along with whether one of those categories is met. We conclude that the trial court adequately considered the best interest of the child in choosing to waive Father's consent.

[¶38.] In *C.D.B.*, we stated that the trial court must first evaluate whether the natural parent had abandoned the child. 2005 S.D. 115, ¶¶ 10-11, 706 N.W.2d at 814. Then, the trial court should evaluate "whether the child's best interests will be served by terminating the rights of the parent so that an adoption can proceed without that parent's consent." *Id.* ¶ 11. Here, the trial court bifurcated the

proceedings according to *In re Adoption of Zimmer*, 299 N.W.2d 574 (S.D. 1980). The trial court first waived Father's consent to the adoption. It then determined it was in the best interest of the child to proceed with the adoption. We hold that this was sufficient under SDCL 25-6-4. The trial court did not abuse its discretion in finding that it was in the best interest of the child to waive Father's consent to the adoption and allow Stepfather to adopt Z.N.F. where Father had abandoned Z.N.F., continuously neglected him, and failed to provide child support.

## Conclusion

[¶39.]     Under a different set of facts, Mother's deliberate attempts to conceal Z.N.F. from Father would likely excuse his failure to maintain contact with his son. We must reiterate that we do not condone Mother's attempts to deny Father's visitation with his son. However, Mother's obstacles do not excuse Father's failure to attempt to make contact with Z.N.F., nor do the obstacles excuse Father's willful failure to pay child support. The trial court did not err in waiving Father's consent to the adoption and in determining that it was in the best interest of Z.N.F. to grant the stepparent adoption. We affirm.

[¶40.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and WILBUR, Justices, concur.